### MORRIS et al. v. GLOBE NAVIGATION CO.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1914. Rehearing Denied March 10, 1914.)

#### No. 2267.

COLLISION (§ 95*)—STEAM VESSELS—FAULT.

A collision at night in the Carquinez Straits between a steamship and a tug with a barge loaded with stone on her side *held*, on the evidence, due solely to the fault of the tug in giving a passing signal of one whistle and going to starboard across the course of the steamship, which was then on her starboard side.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

Appeal from the District Court of the United States for the First Division of the Northern District of California; John J. De Haven, Judge.

Libel in admiralty for collision by the Globe Navigation Company against the steam tug Ada Warren; Daniel E. Morris, Louis A. Lloyd, and J. A. Maguire, trustees of the Warren Improvement Company, claimants. Decree for libelant, and claimants appeal. Affirmed.

Louis T. Hengstler, of San Francisco, Cal., for appellants.

William Denman and Denman & Arnold, all of San Francisco, Cal., for appellee.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. About 4:30 a. m. of October 11, 1906, a collision occurred between the steamship Meteor and the tug Ada Warren having in tow a barge loaded with rock, resulting in damage to the ship, to recover which the present libel·was brought. The trial court found the tug solely in fault and gave judgment for the libelant, to reverse which the claimants of the tug brought this appeal. ·

It is conceded that at the time of the collision the captain of the tug was asleep and did not come on deck until after it had occurred. The tug was at the time in charge of a pilot named Oden, and there was also on it as lookout a seafaring man who seems to have disappeared; at all events, he was not produced as a witness by either party. There was also on the tug as a passenger a man named Miller, who, it appears, had had many years' experience at sea, but who seems from the record to have then had some connection with the rock company. The collision occurred at a point somewhere in the Carquinez Straits. In the appellants' answer to the libel it was, among other things, alleged as follows:

"That, on the 11th day of October, at the hour of about half past 4 o'clock a. m., the tug Ada Warren, with a barge heavily laden with rock lashed to her starboard side, was about to enter the Straits of Carquinez, proceeding in the direction from San Pablo Bay. That just as she was rounding a point near the place called Oleum, and entering the said straits, a red light was seen a little to starboard by those in charge of and navigating said tug, which red light proved to be the port light of the steamship Meteor, coming down the stream at a considerable rate of speed. The tug Ada Warren thereupon blew one whistle to indicate her intention to go to the starboard of said approaching vessel and ported her helm. That, in the moment when said signal was given and said maneuver executed, it appeared to those in charge of the tug that but for said maneuver the fast approaching vessel of large size would strike the tug or her barge amidship and probably sink them or one of them. That said signal of one whistle was not answered by said steamship, but after a short interval of time two whistles were heard coming from said steamship, and simultaneously she showed her green light in close proximity. A collision then appearing impending and almost inevitable, the officer in charge of the watch on the tug, in order to ease the blow which he expected the tug and her barge to receive, gave three whistles and signaled to the engineer of said tug to reverse, full speed astern. Immediately thereafter the steamship and the barge came together. That, owing to the excessive speed of said Meteor in the locality where said vessels met, and to her failure to respond to and act upon the signals of the Ada Warren, and to the change of the Meteor's course to her port, the collision between the two vessels occurred in spite of the effort of the tug to keep out of the way of said steamship; and that· by the .fault of· said steamship Meteor, her officers and crew, the said tug and her barge, together with the cargo of said barge, suffered severe damage, and that the damage so received amounted to not less· than the sum of ——— dollars."

Subsequently the answer was amended by striking therefrom the clause reading:

"That said signal of one whistle was not answered by said steamship, but after a short interval of time two whistles were heard coming from said steam ship, and simultaneously she showed her green light in close proximity."

The answer was verified by D. O. Church, secretary of the Warren Improvement Company, who, in his verification, stated:

"That the source of deponent's knowledge in the premises is information received by deponent from the master and pilot of said steamship Ada Warren, and that deponent verily believes the same to be true."

As has been said, the lookout on, the tug was not called by either party; nor was the pilot, Oden, in respect to whom the record shows that the proctor for the claimants stated to the trial court that he requested Church to find Oden, and, after having done so:

"That then we had a conference with reference to Oden, and went carefully over his testimony given before the local inspectors. I am sorry to say that that testimony, which was taken on two different dates, shows that he seems to have changed his mind between the first date and the second date, for some unaccountable reason, so that we cannot call him as a trustworthy witness. After Saturday we gave up the attempt to find him and call him as a witness. That is the unfortunate predicament we are in in this case, if your honor please. We shall have to rely entirely, outside of the evidence given by Capt. Hammer with reference to the locality and the circumstances surrounding this occurrence, upon the evidence as it appears in the depositions on the other side."

The record shows that at the time in question the Meteor was going down the straits from Port Costa at about eight knots an hour, and that the Ada Warren with the barge lashed to her starboard side was proceeding up the straits bound for Suisun Bay. The night was clear, and a strong tide running, which of course lessened the speed at which the ship was going. Her master was examined as a witness, and his testimony is, in part, substantially as follows:

That he first saw the tug about a point and a half off the port bow of the Meteor, first seeing her upper masthead light, then the lower one, and a green light. That the green light seemed to be proceeding across the straits, but he was not able to determine whether the tug was going directly across or at an angle, although he thought she was bound for South Vallejo. That when the two vessels were about 1,000 feet apart the green light of the tug crossed the bow of the Meteor from port to starboard until it could be seen probably one-quarter of a point on the starboard side of the ship, and that then the Ada Warren showed both red and green lights and blew her whistle. That up to that time the Meteor had held her course and speed, but then answered with one whistle, and her wheel was at once brought hard aport, and seeing that a collision was imminent she blew three whistles and was started full speed astern, the effect of which was to swing her bow to starboard. That the Ada Warren never gave any other signal than the one whistle. That the starboard bow of the barge struck the Meteor about 35 feet aft of her port bow, inflicting the injury for which the libel was brought.

It is earnestly insisted by the appellants' proctor that the testimony of the Meteor's master is in direct conflict with an affidavit made by him on the 12th of October, 1906, which is printed in the transcript and which it is insisted on behalf of the appellants this court should consider for the reason, as is said, that they were not aware of its existence in time to have introduced it in evidence on the trial or to have

called it to the attention of the master at the time of his examination as a witness.

A perusal of the affidavit shows that in it the master (McFarland) states that, when he discovered the green light of the tug off the port bow of the Meteor, it was about 1½ miles distant, whereas in his testimony he gives the distance as approximately 3 miles; but upon the important points in the case we do not discover the positive conflict between his affidavit and testimony that the appellants' proctor insists exists. The substance of his testimony upon those points has already been stated, and upon the points referred to the affidavit is as follows:

"That having the right of way, under the local rules, the Meteor held her course. Both vessels continued until seeing that the other vessel was not changing her course, as she should have done, and seeing there was danger of collision, the deponent started to put his helm to starboard to change his course to port to avoid collision, and had started to blow his whistle to give notice to this effect, when suddenly the other vessel, which subsequently proved to be the tugboat Ada Warren with barge alongside, blew one whistle and changed her course, showing a red light. (At this time of changing his course when he started to give two blasts of his whistle, the deponent had already pulled the whistle cord and a short blast had been given before the change of course of the Ada Warren was noticed.) Immediately the red light was seen, the engines were ordered full speed astern and three short blasts given to indicate this procedure. The Ada Warren seemed to continue on her course, and within about two minutes struck the Meteor on the port bow, doing considerable damage to the Meteor and sustaining damage herself. That at the time of the collision, in the opinion of the deponent, the Meteor had practically lost her headway. That at the time of the collision Second Officer Look and Quartermaster Harry Johnson were on the bridge with the deponent."

The appellants' proctor insists that the master in his affidavit states that the Meteor was the first of the two vessels to blow one whistle. We do not so understand the affidavit. The statements in it are confused, but what we think the master does therein state is that, having the right of way, the Meteor held her course, and, seeing that the tug was not changing hers and that there was danger of collision, he "started" to put his helm to starboard to change his course to port in order to avoid collision, and had "started" to blow his whistle to give notice to that effect when suddenly the tug blew one whistle and changed her course, showing a red light. He then states in the affidavit that he gave a short blast before he noticed the change of course of the Ada Warren. This is by no means saying that the Ada Warren had not before that blown her whistle. His testimony, as has been seen, is positive to the effect that the tug first blew the one whistle, and in that respect, as in others, the master of the Meteor is corroborated by the positive testimony of the only disinterested eyewitness to the accident—Miller, the passenger on the tug. And the master's testimony to the effect that the tug blew the first one blast is somewhat corroborated by the finding of the local inspectors as to what the pilot of the tug testified before them, which finding is in the record (although the testimony of the pilot is not) and is as follows:

"We also find from the evidence taken in the above-entitled matter that the tug Ada Warren was in charge of Pilot William T. Oden, at the time of the collision; and we are satisfied that he was negligent in navigating said vessel on that occasion, inasmuch as he violated rule III of the Pilot Rules for At-

lantic and Pacific Coast Inland Waters, in not blowing four blasts of the steam whistle, when, as he testified, the Meteor blew two blasts of the whistle after the Ada Warren had blown one blast."

It will be seen from this finding that the Pilot Oden testified before the local inspectors that the Ada Warren had blown one blast before the master of the Meteor blew two to give notice of his intent to change his course to port.

Apart from this, we find positive confirmation of the master's testimony in the following portions of that of the only disinterested eye-witness to the occurrences in question:

"Q. Did you, going up the stream, at any time see a steamer coming down the stream? A. Yes, sir.

"Q. Was that the steamer that run into you? A. Yes, sir; it was this way—

"Q. One moment. Whereabouts was the steamer with reference to the channel; not with reference to your vessel, but with reference to the channel of the Carquinez Straits, when you saw her? A. I was in the towboat, and I went over to the barge, over here. The towboat blew one whistle. I stepped on the lower boxes and looked over the boxes.

"Q. Was it necessary for you to look over the boxes? A. Yes, sir; certainly; I could not see. I had to step over so that I could see what was going on.

"Q. On which side of the boxes were you? A. Right amidships.

"Q. On the port side? A. I was right in amidships of the barge, and stepped on the boxes and looked right ahead.

"Q. Were you standing on the port or starboard side of the barge? A. I was standing right in the middle of the barge.

"Q. On the port or starboard side? A. Right in the middle of the barge.

"Q. In which direction did you look to see the steamer, port or starboard? A. Starboard bow. I could see the steamer about half a point from the bow. When I was on this lookout I sang out: 'She is about half a point on the starboard bow.'

"Q. This was just after you heard this one whistle? A. Yes, sir; that is all I noticed, one whistle that they blew. I came down again, and think everything was all right, and I took a tumble to myself that there might be a mistake, and I went outside the boxes on the barge on the starboard side and I looked to see where the steamer was, and there came the steamer right across the channel—that big steamer. It came right across. I think I says, 'He run into us.' I jumped on board of the tow, and it throwed me down on deck.

"Q. From the force of the collision? A. Yes, sir; it throwed me right down on deck when the towboat was going.

"Q. After the time that you heard the one whistle, did you see anything that went on in the pilothouse of the tugboat? A. No, sir; I can say nothing from that.

"Q. What direction was the course of the steamer changed, the steamer that was approaching you? From what direction to what direction? A. He changed to the east. Here is east and there is west (illustrating). No, here is west and this is east.

"Q. In one moment. In what direction, considering the starboard and port side of the steamer, did she turn to her starboard or port side? A. She turned to her starboard side.

"Q. After that the collision occurred? A. Yes, sir.

"Q. What point of the barge was hit? A. Just on the corner of the barge.

"Q. Starboard or port corner? A. The starboard corner. The big steamer went across us. I was standing outside of the barge and I expected to see the barge go right through.

"Q. Let me ask you: When you saw the vessel approaching on your starboard bow, if you had continued on the course you were on, would you have cleared her? If the tug and tow had continued on the course you were on when you saw the vessel on the starboard bow, would you have cleared her?

211 F.—56

"Mr. Hengstler: I object to that question.

"The Court: Let him answer.

"A. Yes, sir; I believe it. He was blowing no whistle; he blew one whistle, and the big steamer changed his course and went across us. The barge did not change its course at all. I cannot say that—nothing about that. The big steamer changed and came across.

"Mr. Denman: Q. As I understand it, at the time that you saw the big steamer coming down the channel the vessels would have cleared if you had kept on your courses. A. Yes, sir.

"Q. Was that because the steamer was sufficiently on your starboard bow to clear you? A. If our towboat only blew two whistles, he would have been all right. The tug only blew one whistle, and that was the cause of the accident; the big steamer run into us. I told that to the captain of the tugboat right there. He wanted to know my name. I said, 'Captain, you only blew one whistle, and you might as well leave me out altogether.'"

We are of the opinion that the evidence in the case does not justify us in setting aside the findings of fact made by the trial court. And as it appears that when the lights of the tug were first seen by the master of the ship the vessels were on crossing courses, we are further of the opinion that the court below was right in holding, as it did, that as the tug had the ship on her starboard bow it was the duty of the tug to keep out of the way, and that it was clearly in fault in crossing or attempting to cross the bow of the privileged vessel, under the circumstances of the case. See The Delaware, 161 U. S. 468, 16 Sup. Ct. 516, 40 L. Ed. 771; The George S. Shultz, 84 Fed. 508, 28 C. C. A. 476; Hughes on Admiralty, § 130.

We also think that we would not be justified, in view of the evidence, in interfering with the findings of the commissioner, approved by the trial court, in respect to the amount of damages, demurrage, and insurance premium allowed the libelant.

The judgment is affirmed.